**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PATRICK YERBY, derivatively on behalf of TIVITY HEALTH, INC. | |
|      Plaintiff, | C.A. No. _____ |
|      v. | |
| DONATO J. TRAMUTO, ADAM C. HOLLAND, DAWN M. ZIER, SARAH J. FINLEY, ROBERT GRECZYN, JR., PETER A. HUDSON, BETH M. JACOB, BRADLEY S. KARRO, PAUL H. KECKLEY, BENJAMIN A. KIRSHNER, LEE A. SHAPIRO, ARCHELLE GEORGIOU, DANIEL G. TULLY, and KEVIN G. WILLS, | **DEMAND FOR JURY TRIAL** |
|      Defendants, | |
|      and | |
| TIVITY HEALTH, INC., | |
|      Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Patrick Yerby ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Tivity Health, Inc. ("Tivity" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Donato J. Tramuto, Adam C. Holland, Dawn M. Zier, Sarah J. Finley, Robert J. Greczyn, Jr., Peter A. Hudson, Beth M. Jacob, Bradley S. Karro, Paul H. Keckley, Benjamin A. Kirshner, Lee A. Shapiro, Archelle Georgiou, Daniel G. Tully, and Kevin G. Wills (collectively, the "Individual Defendants," and together with Tivity, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of

Tivity, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tivity, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Tivity's directors and officers from March 8, 2019 through the present (the "Relevant Period").

2.      Based in Franklin, Tennessee, Tivity purports to be a leading provider of various nutrition, fitness, and weight management programs and services. The Company's business is organized into two segments: "Healthcare" and "Nutrition."

3.      In December 2018, Tivity began acting on plans to acquire Nutrisystem, Inc. ("Nutrisystem,") a company offering a portfolio of weight loss products and related services, such as meal plans and counseling resources. According to the Individual Defendants, acquiring Nutrisystem would, among other things, elevate the Company's business prospects and create "meaningful value" for Tivity shareholders.

4.     The Company completed its acquisition of Nutrisystem on March 8, 2019, for which the Company paid approximately $1.3 billion in cash and stock. Following the acquisition, the Individual Defendants frequently lauded the benefits of Nutrisystem, and represented that the ongoing integration of Nutrisystem into Tivity's Nutrition segment was proceeding smoothly. Yet, in reality, due to issues with the integration of Nutrisystem, the Company's Nutrition segment was facing substantial operational challenges, and would negatively impact the Company's performance, as the Individual Defendants would ultimately reveal nearly a year after the closing of the acquisition.

5.     The truth emerged on February 19, 2020, when the Company disclosed disappointing financial results for the fourth fiscal quarter of 2019, including a non-cash impairment charge of approximately $377 million attributable to the Company's Nutrition segment. The Company also revealed that Defendant Donato J. Tramuto ("Tramuto"), the Company's Chief Executive Officer ("CEO"), would be stepping down from his positions with the Company, effective immediately.

6.     Later that same day, during a conference call held to discuss the Company's financial results, certain of the Individual Defendants further revealed that the Company's nutrition business had "not worked out as well as planned" since the Company acquired Nutrisystem in March 2019, and that Nutrisystem was performing "well below its potential."

7.     On this news, the price of the Company's stock plummeted by over 45%, falling from $22.93 per share at the close of trading on February 19, 2020, to $12.50 per share at the close of trading on February 20, 2020.

8.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series

of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Tivity's integration of Nutrisystem into the Company's Nutrition segment was not proceeding as well as the Individual Defendants purported, and consequently, the Nutrition segment was facing serious operational challenges; (2) the foregoing issues would predictably have a substantial negative impact on the Company's financial results and overall prospects; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

9.      The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

11.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 78,258 shares of the Company's common stock were repurchased between June 2019 and February 2020 for approximately $1.41 million. As the Company's stock was actually only worth $12.50 per share during that time, the price at closing on February 20, 2020, the Company overpaid by approximately $433,293 in total.

12.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's former CEO, and the Company's Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Tennessee (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's current directors, of the substantial likelihood of the current directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and/or the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Tivity common stock. Plaintiff has continuously held Tivity common stock at all relevant times. Plaintiff is a citizen of Massachusetts.

### Nominal Defendant Tivity

20.     Nominal Defendant Tivity is a Delaware corporation with its principal executive offices at 701 Cool Springs Boulevard, Franklin, Tennessee 37067. Tivity stock trades on the NASDAQ under the ticker symbol "TVTY."

### Defendant Tramuto

21.     Defendant Tramuto served as the Company's CEO from 2013 until his employment was terminated and he resigned from the Board on February 19, 2020. According to the Company's Schedule 14A filed with the SEC on April 7, 2020 (the "2020 Proxy Statement"), as of March 23, 2020, Defendant Tramuto beneficially owned 277,292 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Tramuto owned over $1.19 million worth of Tivity stock.

22.     For the fiscal year ended December 31, 2019, Defendant Tramuto received $4,776,734 in compensation from the Company. This included $932,885 in salary, $3,200,002 in stock awards, $611,488 in non-equity incentive plan compensation, and $32,361 in all other compensation.

23.     The Company's Schedule 14A filed with the SEC on April 12, 2019 (the "2019 Proxy Statement") stated the following about Defendant Tramuto:

> Mr. Tramuto has served as Chief Executive Officer of the Company since November 2015. He has served on the Board since May 2013 and was Chairman of the Board from June 2014 until becoming Chief Executive Officer in November 2015. From 2008 until November 2015, Mr. Tramuto served as Chief Executive Officer and Chairman of Aptus, formerly known as PIH, which was sold in 2013 to Merck Global Health Innovation Fund.  Prior to founding PIH, he served as President of the Physicians Interactive Division of Allscripts from 2006 to 2008.  From 2004 to 2006, Mr. Tramuto was Chief Executive Officer of i3 Pharmaceuticals, LLC, a global pharmaceutical services company that, prior to its sale to inVentiv Health, Inc. in 2011, was part of Ingenix, Inc. (a subsidiary of UnitedHealth Group Incorporated).  Prior to joining Ingenix, Mr. Tramuto was one of the founders of Protocare, Inc. ("Protocare"), a large provider of drug development services, where he served as Chief Executive and President of the Protocare Sciences Division and Corporate Officer of Protocare from 1998 to 2003.  Prior to co-founding Protocare, Mr. Tramuto served as General Manager/Executive Vice President of the Home Healthcare Business Unit and Corporate Vice President of Disease Management Marketing at Caremark.  Mr. Tramuto currently serves on the board of directors of Sharecare, Inc., a private health and wellness company, and GoCheckKids, a private digital health solutions company.  Mr. Tramuto also serves on executive leadership boards including service on the Boston University School of Public Health Dean's Advisory Board and as a Board Trustee at the Robert F. Kennedy Center for Justice and Human Rights Europe Board.  Mr. Tramuto is the founder of Health eVillages, where he serves on the board, and a former member of the State of Maine Economic Growth Council, an appointment by former Maine Governor John Baldacc.

24.     Upon information and belief, Defendant Tramuto is a citizen of Tennessee.

**Defendant Holland**

25.     Defendant Adam Holland ("Holland") has served as the Company's CFO since 2017. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant

Holland beneficially owned 13,545 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Holland owned approximately $58,514 worth of Tivity stock.

26.     For the fiscal year ended December 31, 2019, Defendant Holland received $1,402,157 in compensation from the Company. This included $389,231 in salary, $874,996 in stock awards, $127,566 in non-equity incentive plan compensation, and $10,364 in all other compensation.

27.     The Company's website stated the following about Defendant Holland:[1]

As Chief Financial Officer (CFO), Adam Holland is responsible for all corporate financial functions including planning and analysis, forecasting and budgeting, external reporting, enterprise risk management as well as strategic initiatives and procurement. Holland joined Tivity Health as CFO in 2017.

Holland has served in a variety of executive financial roles throughout his career, including a 12-year tenure at retailer Kirkland's, Inc., where he became Chief Financial Officer in 2015. Holland also spent three years earlier in his career as a senior auditor with Ernst & Young, LLP.

Holland holds a Bachelor of Science degree in Business Administration and a Master of Accountancy from the University of Tennessee at Martin.

28.     Upon information and belief, Defendant Holland is a citizen of Tennessee.

**Defendant Zier**

29.     Defendant Dawn M. Zier ("Zier") served as the Company's President, Chief Operating Officer ("COO"), and as a director from March 8, 2019 until she resigned on December 4, 2019. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Zier beneficially owned 386,453 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Zier owned over $1.66 million worth of Tivity stock.

---

[1] http://www.tivityhealth.com/management/adam-holland/ (last visited June 29, 2020).

30.     For the fiscal year ended December 31, 2019, Defendant Zier received $11,341,910 in compensation from the Company. This included $652,055 in salary, $8,750,003 in stock awards, and $1,939,852 in all other compensation.

31.     The Company's 2019 Proxy Statement stated the following about Defendant Zier:

Ms. Zier has served as President and Chief Operating Officer of the Company since the Company's acquisition of Nutrisystem in March 2019. Ms. Zier served as the President and Chief Executive Officer of Nutrisystem and as a member of its board of directors from November 2012 until the acquisition of Nutrisystem by the Company. Before joining Nutrisystem, Ms. Zier served as the President of International at The Reader's Digest Association, Inc., a global media and direct marketing company (the "Reader's Digest Association"), from April 2011 until November 2012. Prior to that, she served in various other management positions at the Reader's Digest Association, including President of Europe and President of Global Consumer Marketing. In February 2013, RDA Holdings, Co., the holding company and parent of Reader's Digest Association, filed a voluntary petition for reorganization relief pursuant to Chapter 11 of the United States Bankruptcy Code. Ms. Zier currently serves on the board of Spirit Airlines, a public commercial airline, joining in 2015, and the board of The Hain Celestial Group, a public organic food and natural products company, joining in 2017. Ms. Zier served on the Velo Holdings Inc. Board of Directors from 2015 to 2016 and the Data and Marketing Association's Board of Directors from 2008 to 2015. In her capacity as a public company director, she has served on both audit and compensation committees and has chaired nominating and corporate governance committees.

32.     Upon information and belief, Defendant Zier is a citizen of New York.

**Defendant Finley**

33.     Defendant Sarah J. Finley ("Finley") has served as a Company director since 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Strategic Review Committee. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Finley beneficially owned 13,474 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Finley owned approximately $58,207 worth of Tivity stock.

34.     For the fiscal year ended December 31, 2019, Defendant Finley received $205,008

in compensation from the Company, which consisted of $95,000 in fees earned or paid in cash and $110,008 in stock awards.

35.    The Company's 2020 Proxy Statement stated the following about Defendant Finley:

> Ms. Finley is the Principal of Threshold Corporate Consulting, LLC, a consulting services firm that she founded in 2015. From 2009 to 2011, Ms. Finley served as Senior Vice President and General Counsel of CVS Health Corporation, formerly known as CVS Caremark Corporation (including its predecessor companies, "CVS Caremark"), a publicly traded pharmacy services company. From 2007 to 2009, Ms. Finley served as Senior Vice President and General Counsel of the pharmacy benefits management division of CVS Caremark, and from 2011 until her retirement from the company in 2015, Ms. Finley served as a senior legal advisor for CVS Caremark. From 1998 to 2007, Ms. Finley served as Senior Vice President, Assistant General Counsel and Corporate Secretary of Caremark Rx, Inc., a publicly traded company and a predecessor of CVS Caremark. Previously, she was a partner at the law firm Kutak Rock in Atlanta, Georgia. Ms. Finley graduated from the University of Alabama and received her law degree from Vanderbilt University. She currently serves on the board of directors of Preferred Apartment Communities, Inc., a publicly traded real estate investment trust, Oak Paper Products Company, Inc., a privately-held paper products, packaging and janitorial supply company based in Los Angeles, California and Studio Bank, a community bank based in Nashville, Tennessee. Ms. Finley is President of the Vanderbilt Law School Board of Advisors and has also served on several Nashville non-profit boards, including Alive Hospice, The Land Trust for Tennessee, The Center for Nonprofit Management, the Community Foundation of Middle Tennessee and The Nashville Food Project.

36.    Upon information and belief, Defendant Finley is a citizen of Tennessee.

**Defendant Greczyn**

37.    Defendant Robert J. Greczyn, Jr. ("Greczyn") has served as a Company director since 2015. Previously, he served as the Company's interim CEO from February 18, 2020 until May 21, 2020. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Greczyn beneficially owned 102,374 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Greczyn owned approximately $442,255 worth of Tivity stock.

38.     For the fiscal year ended December 31, 2019, Defendant Greczyn received $215,008 in compensation from the Company, which consisted of $105,000 in fees earned or paid in cash and $110,008 in stock awards.

39.     The Company's 2020 Proxy Statement stated the following about Defendant Greczyn:

> Mr. Greczyn has served as the Interim Chief Executive Officer of the Company since February 18, 2020.  He was the Chief Executive Officer of Blue Cross Blue Shield of North Carolina ("BCBSNC") from 2000 until his retirement in 2010, where he also served on the Board of the Blue Cross Blue Shield Association.  Since 2010, Mr. Greczyn has served as Principal Manager of Capital Food Group, LLC and RJG Restaurant Group LLC, privately held restaurant franchise operations.  From August 1998 until September 1999 he was the Chief Operating Officer of BCBSNC and became its President in September 1999.  From 1990 to 1998, he was the President and CEO of Carolina Physicians Health Plan, a health maintenance organization, which was partially acquired by Healthsource, Inc. in 1991 and fully acquired by Healthsource, Inc. in 1994, at which time it became Healthsource North Carolina. In 1997, Cigna Corporation acquired Healthsource, Inc. From 1986 to 1990, Mr. Greczyn was President and CEO of Health Plan of Delaware, Ltd. (which was acquired by Principal Health Care, Inc. in 1988, at which time it became Principal Health Care of Delaware, Inc.).  From March 2011 to November 2014, Mr. Greczyn served on the Board of Directors of Liposcience, Inc., a publicly traded (until its acquisition by Laboratory Corporation of America in November 2014) clinical diagnostic company, where he chaired the compensation committee and was a member of the audit committee.  He also served as the interim President and Chief Executive Officer of Liposcience, Inc. from August 2013 until February 2014, during which time he resigned from his positions on the audit and compensation committees.  From October 2011 until August 2012, Mr. Greczyn served as a director of M*Modal Inc., a publicly traded (until its acquisition August 2012 by One Equity Partners) provider of interactive clinical documentation and speech understanding technology, where he was a member of the compensation and audit committees.  From 2006 to 2008, Mr. Greczyn was Chairman of the Board of the Council for Affordable Quality Care, an alliance of chief executive officers of the nation's leading health insurers working to simplify healthcare transactions. Mr. Greczyn also serves as a board member of Vidant Health, of which he is also the chair of the compensation committee, and Vidant Medical Center, a not for profit large hospital, of which he is also a member of the quality committee and the executive committee.  Mr. Greczyn received an M.P.H. degree in health policy from the University of North Carolina at Chapel Hill and a B.A. degree in psychology from East Carolina University.

40.     Upon information and belief, Defendant Greczyn is a citizen of North Carolina.

**Defendant Hudson**

41.     Defendant Peter A. Hudson ("Hudson") has served as a Company director since 2016. He also serves as a member of the Audit Committee and the Strategic Review Committee. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Hudson beneficially owned 60,361 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Hudson owned approximately $260,759 worth of Tivity stock.

42.     For the fiscal year ended December 31, 2019, Defendant Hudson received $210,008 in compensation from the Company, which consisted of $100,000 in fees earned or paid in cash and $110,008 in stock awards.

43.     The Company's 2020 Proxy Statement stated the following about Defendant Hudson:

> Dr. Hudson has served as a Managing Director at Alta Partners, a healthcare venture capital firm, since February 2017. He also serves on numerous boards, including U.S. Acute Care Solutions ("USACS"), one of the nation's largest acute care companies, since May 2015, and Emergency Medicine Physicians Holding Company, one of USACS' founding organizations, since July 2014. In addition, Dr. Hudson has been on the board of directors for mobile acute care provider DispatchHealth since August 2015, and has served as senior advisor to venture-backed Augmedix, Inc., a privately-held company that operates in the information technology services & consulting industry, since January 2015. From 2008 to March 2014, Dr. Hudson was Chief Executive Officer of iTriage LLC, a mobile healthcare company, which was acquired by Aetna, Inc. Dr. Hudson then served as Head of Consumer Technologies at Aetna from October 2013 through March 2014. From 2001 to 2010, Dr. Hudson was managing business partner for Emergency Physicians at Porter Hospitals, an emergency medicine staffing company in Denver, Colorado. Dr. Hudson was the Colorado Technology Association's Entrepreneur of the Year in 2013 and a guest of the First Lady at the State of the Union in 2013, representing digital health as a national policy objective. He holds a B.A. in Political Science and Pre-Med from Colorado College and an M.D. from the University of Colorado School of Medicine.

44.     Upon information and belief, Defendant Hudson is a citizen of Colorado.

**Defendant Jacob**

45.     Defendant Beth M. Jacob ("Jacob") has served as a Company director since 2018. She also serves as a member of the Audit Committee and the Compensation Committee. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Jacob beneficially owned 10,974 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Jacob owned approximately $47,407 worth of Tivity stock.

46.     For the fiscal year ended December 31, 2019, Defendant Jacob received $210,008 in compensation from the Company, which consisted of $100,000 in fees earned or paid in cash and $110,008 in stock awards.

47.     The Company's 2020 Proxy Statement stated the following about Defendant Jacob:

After serving in senior leadership roles since 2015 with SPS Commerce, Inc. ("SPS Commerce"), a global leader in cloud-based supply chain management solutions, Ms. Jacob retired in April 2019 from her position as Senior Vice President, Strategic Advisor and Leadership Coach of SPS Commerce, which began in March 2018, and supported the work of SPS Commerce as an independent consultant through August 2019.  From 2015 to March 2018, Ms. Jacob was the Senior Vice President, Chief Customer Success Officer, at SPS Commerce, where she created a high energy and innovative customer success organization that delivers new services and value to drive retention and growth.  From 2002 to 2014, Ms. Jacob was an executive with Target Corporation ("Target"), a leading upscale discount retailer that provides high-quality merchandise with a guest-friendly experience across store and digital channels.  At Target, she was Executive Vice President and Chief Information Officer from 2010 to 2014 and Senior Vice President and Chief Information Officer from 2008 to 2010. Ms. Jacob also was responsible for the global operations of Target India from 2011 to 2014. From 2006 to 2008, Ms. Jacob was the Vice President of Target Financial Services, Guest Operations, leading the contact center and collection operations team that provided services to Target's customers.  From 2003 to 2006, Ms. Jacob was Vice President of Target Financial Services, Guest Contact Centers, and from 2002 to 2003, she was the Director of Target Financial Services, Guest Contact Centers. Prior to joining Target, Ms. Jacob spent 15 years at Ameriprise Financial, Inc. (formerly known as American Express Financial Advisors), a leading diversified financial services firm dedicated to helping customers achieve their financial goals.  Ms. Jacob graduated with a B.S. degree from the University of Minnesota in 1984 and received her

Master of Business Administration degree from the University of Minnesota Carlson School of Management in 1989. Ms. Jacob has served on several non-profit boards, and currently serves on the Twin Cities Habitat for Humanity Board of Directors, where she serves on the Strategic Planning Committee and the Development Committee.

48.     Upon information and belief, Defendant Jacob is a citizen of Minnesota.

**Defendant Karro**

49.     Defendant Bradley S. Karro ("Karro") has served as a Company director since 2014. He also serves as the Chair of the Compensation Committee and as a member of the Strategic Review Committee. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Karro beneficially owned 47,964 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Karro owned approximately $207,204 worth of Tivity stock.

50.     For the fiscal year ended December 31, 2019, Defendant Karro received $215,008 in compensation from the Company, which consisted of $105,000 in fees earned or paid in cash and $110,008 in stock awards.

51.     The Company's 2020 Proxy Statement stated the following about Defendant Karro:

Mr. Karro is a principal of Hillcote Advisors, a firm focused on investing in and restructuring healthcare companies that Mr. Karro founded in May 2007. Prior to starting Hillcote Advisors, Mr. Karro held a number of senior executive positions in the healthcare industry, including serving as Executive Vice President of Caremark Rx, a prescription benefit management company. Mr. Karro joined Medpartners (which changed its name to Caremark Rx) in 1998, and served at Caremark Rx through 2007. During his time at Caremark Rx, Mr. Karro was responsible for mergers and acquisitions, integration planning, information technology and Medicare product development. Mr. Karro was also appointed as a charter member of the Governor's e-Health Advisory Council in Tennessee, an organization established to coordinate Tennessee's initiatives leading towards the adoption of electronic medical records. From October 2013 to March 2017, Mr. Karro served as a member of the Board of Directors of Angiotech Pharmaceuticals, Inc., a global specialty pharmaceutical and medical device company, where he chaired the Audit Committee. Mr. Karro previously served on the Board of

Directors of Emageon Inc., an information technology systems provider for hospitals, healthcare networks, and imaging facilities, from 2008 through 2009.

52.     Upon information and belief, Defendant Karro is a citizen of Tennessee.

**Defendant Keckley**

53.     Defendant Paul H. Keckley ("Keckley") served as a Company director from 2014 until he resigned on May 21, 2020. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Keckley beneficially owned 73,449 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Keckley owned approximately $317,299 worth of Tivity stock.

54.     For the fiscal year ended December 31, 2019, Defendant Keckley received $215,008 in compensation from the Company, which consisted of $105,000 in fees earned or paid in cash and $110,008 in stock awards.

55.     The Company's 2019 Proxy Statement stated the following about Defendant Keckley:

> Dr. Keckley has been the Managing Director of The Keckley Group, an independent healthcare research and policy analysis firm, since December 2012. In addition, Dr. Keckley is the Editor of The Keckley Report, which he began publishing in September 2013, and an expert on health industry trends and U.S. health system reform. Dr. Keckley was the Managing Director of Navigant Center for Healthcare Research and Policy Analysis from March 2014 through February 2016. In his 40-year health industry career, Dr. Keckley has served as an expert commentator for national media coverage of healthcare reform, CEO of four health care companies funded by private investors, in senior management at Vanderbilt Medical Center and most recently as Executive Director of the Deloitte Center for Health Solutions in Washington, D.C, a position he held from 2006 through September 2013. Dr. Keckley currently serves on the Advisory Boards of Western Governors University and Lipscomb University College of Pharmacy.

56.     Upon information and belief, Defendant Keckley is a citizen of Washington, D.C.

**Defendant Kirshner**

57.    Defendant Benjamin A. Kirshner ("Kirshner") has served as a Company director since March 8, 2019. He also serves as a member of the Nominating and Corporate Governance Committee and the Strategic Review Committee. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Kirshner beneficially owned 31,033 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Kirshner owned approximately $134,062 worth of Tivity stock.

58.    For the fiscal year ended December 31, 2019, Defendant Kirshner received $200,289 in compensation from the Company, which consisted of $71,949 in fees earned or paid in cash and $128,340 in stock awards.

59.    The Company's 2020 Proxy Statement stated the following about Defendant Kirshner:

> Since January 1, 2019, Mr. Kirshner has served as Chairman of the board of directors of Tinuiti, Inc. (f/k/a Elite SEM Inc.) ("Tinuiti"), a digital marketing agency which he founded in 2004. From its founding until December 2018, Mr. Kirshner served as Tinuiti's Chief Executive Officer. Under his guidance, Tinuiti grew to over 500 employees, has more than 800 clients and manages over $1 billion in advertising spend. Mr. Kirshner is also the founder of CoffeeForLess.com, Inc., an e-commerce coffee company which he founded in 1998. Mr. Kirshner began his career in 2000 as an account executive with 24/7 Media Inc., a digital technology company. From 2001 to 2004, he served as an account executive at Send Traffic, Inc., a performance focused, interactive marketing firm specializing in full service search marketing and pay-per-click management services. Mr. Kirshner served as a member of Nutrisystem's board of directors from October 2018 until the Company's acquisition of Nutrisystem in March 2019. From 2006 to 2016 Mr. Kirshner served as an adjunct professor at New York University, teaching courses on search and digital marketing strategies. He serves on the board of directors of several nonprofit organizations, including the Perelman Jewish Day School, the Jewish Federation of Greater Philadelphia and the Children's Hospital of Philadelphia Corporate Council. Mr. Kirshner earned his bachelor's degree in Business Administration in 2000 from George Washington University.

60.    Upon information and belief, Defendant Kirshner is a citizen of Pennsylvania.

**Defendant Shapiro**

61.    Defendant Lee A. Shapiro ("Shapiro") served as a Company director from 2015 until he resigned on May 21, 2020. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Shapiro beneficially owned 40,304 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Shapiro owned approximately $174,113 worth of Tivity stock.

62.    For the fiscal year ended December 31, 2019, Defendant Shapiro received $225,008 in compensation from the Company, which consisted of $115,000 in fees earned or paid in cash and $110,008 in stock awards.

63.    The Company's 2019 Proxy Statement stated the following about Defendant Shapiro:

> Since February 2019, Mr. Shapiro has served as the Chief Financial Officer of Livongo, a private mobile health monitoring technology company ("Livongo"). Since June 2013, Mr. Shapiro has been a Managing Partner of 7wire Ventures, a venture capital firm he co-founded to invest in innovative ideas and entrepreneurs, mostly in the areas of consumer-focused healthcare and education technology. Previously, from 2002 through December 2012, Mr. Shapiro was President of Allscripts Healthcare Solutions, Inc., a publicly traded healthcare information technology company ("Allscripts"), and served as a consultant to the Chief Executive Officer of Allscripts from January 2013 to June 2013. Prior to joining Allscripts, from 1998 to 2000, he was the Chief Operating Officer of Douglas Elliman-Beitler, a commercial office management and development company, where he directed all business activities throughout the United States. In addition to serving on the boards of several privately held companies, Mr. Shapiro currently serves on the boards of directors of Medidata Solutions, Inc., a publicly traded global provider of cloud-based solutions for life sciences (where he is a member of the audit committee and the nominating and corporate governance committee); Aptus Health, Inc. ("Aptus"), formerly known as Physicians Interactive Holdings, LLC ("PIH"), a wholly-owned subsidiary of Merck & Co., Inc., that is one of the largest providers of online resources for healthcare information, medication samples and mobile decision support tools to healthcare professionals (where he chairs the audit committee and is a member of the compensation committee); and

the American Heart Association. Mr. Shapiro holds a J.D. degree from The University of Chicago Law School.

64.     Upon information and belief, Defendant Shapiro is a citizen of Florida.

**Defendant Georgiou**

65.     Defendant Archelle Georgiou ("Georgiou") served as a Company director from 2016 until she resigned on May 23, 2019.

66.     For the fiscal year ended December 31, 2019, Defendant Georgiou received $39,583 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

67.     The Company's Schedule 14A filed with the SEC on April 13, 2018 (the "2018 Proxy Statement") stated the following about Defendant Georgiou:

> Dr. Georgiou is the president of Georgiou Consulting, LLC, a healthcare consulting firm that she founded in December 2007. Previously, Dr. Georgiou worked for UnitedHealth Group Corporation in numerous executive-level positions, including National Medical Director, Chief Medical Officer, CEO – Care Management, and culminating with her position as Executive Vice President – Strategic Relations, Specialized Care Services. Over the course of her career, Dr. Georgiou has made numerous media contributions regarding the latest healthcare industry news and trends, including as a healthcare expert and media correspondent for a twice weekly television segment in Minneapolis-St. Paul, Minnesota. Since March 2014, Dr. Georgiou has been an instructor at the University of Minnesota Carlson School of Management. From 2011 to 2014, Dr. Georgiou served as Senior Advisor to TripleTree, a merchant bank and strategic advisory firm solely focused on healthcare, and Chair of Health Executive Roundtable, a healthcare think tank focusing on innovative changes in the healthcare industry. From 2010 to 2015, Dr. Georgiou served on the Board of Directors of PRGX Global, Inc., a publicly traded provider of recovery audit services, where she was the chair of the nominating and governance committee. Dr. Georgiou graduated from the Johns Hopkins School of Medicine in 1986. She trained and practiced in internal medicine in Northern California before transitioning into healthcare administration and policy.

68.     Upon information and belief, Defendant Georgiou is a citizen of Minnesota.

**Defendant Tully**

69.     Defendant Daniel G. Tully ("Tully") has served as a Company director since August 7, 2019. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Tully beneficially owned 4,557,144 shares of the Company's common stock, which constituted 9.41% of the Company's outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Tully owned over $19.6 million worth of Tivity stock.

70.     The Company's 2020 Proxy Statement stated the following about Defendant Tully:

> Mr. Tully is a co-founder of Altaris Partners, an investment firm, and has served as a managing director of Altaris Partners since 2003. During his tenure at Altaris Partners, Mr. Tully has served on the boards of directors and audit, compensation and compliance committees of a number of healthcare companies, most recently as a director of Senior Helpers, a company that provides in-home senior care, and CSafe, a company that protects vital life science products from temperature excursions during transport. From 1989 to 2002, he held various positions with Merrill Lynch, including serving as the firm's global head of healthcare equity capital markets, and as a member of Merrill Lynch's private equity and investment banking groups. Mr. Tully received a B.S. in Economics from the University of Pennsylvania, Wharton Undergraduate Program.

71.     Upon information and belief, Defendant Tully is a citizen of New York.

**<u>Defendant Wills</u>**

72.     Defendant Kevin G. Wills ("Wills") served as the Chairman of the Board and as a Company director from 2012 until he resigned on May 21, 2020. According to the Company's 2020 Proxy Statement, as of March 23, 2020, Defendant Wills beneficially owned 80,169 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $4.32, Defendant Wills owned approximately $346,330 worth of Tivity stock.

73.     For the fiscal year ended December 31, 2019, Defendant Wills received $310,008

in compensation from the Company, which consisted of $200,000 in fees earned or paid in cash and $110,008 in stock awards.

74.     The Company's 2019 Proxy Statement stated the following about Defendant Wills:

Mr. Wills has been Chairman of the Board since November 2015.  Mr. Wills has served as Chief Financial Officer of Pilot Flying J, the largest operator of travel centers in North America, since February 2019.  From February 2017 to February 2019, he was the Chief Financial Officer of Tapestry, Inc. (formerly Coach, Inc.). From March 2014 to February 2017, Mr. Wills served as Managing Director and Chief Financial Officer of AlixPartners, LLP, a global business advisory firm. From May 2007 through November 2013, he served as Executive Vice President and Chief Financial Officer of Saks Incorporated (now a part of Hudson's Bay Company), a publicly traded (prior to the fourth quarter of 2013) retailer of fashion apparel, shoes, accessories, jewelry, cosmetics and gifts. During his tenure at Saks Incorporated, Mr. Wills served as Executive Vice President of Finance/Chief Accounting Officer from May 2005 through April 2007, and as Executive Vice President of Operations for Parisian, Inc., a retailer, from February 2003 until April 2005. Prior to that, he was appointed Senior Vice President of Planning and Administration for Saks Department Store Group in September 1999, Senior Vice President of Strategic Planning in September 1998 and Vice President of Financial Reporting for Saks Incorporated in September 1997.  Prior to joining Saks Incorporated, Mr. Wills served as Vice President and Controller for Tennessee Valley Authority ("TVA"), an energy producer.  Before joining TVA, Mr. Wills served as the Business Assurance Manager for Coopers and Lybrand (currently known as PwC), an accounting and financial services firm.

75.     Upon information and belief, Defendant Wills is a citizen of Tennessee.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

76.     By reason of their positions as officers, directors and/or fiduciaries of Tivity and because of their ability to control the business and corporate affairs of Tivity, the Individual Defendants owed Tivity and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Tivity in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Tivity and its shareholders so as to benefit all shareholders equally.

77.     Each director and officer of the Company owes to Tivity and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

78.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Tivity, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

79.     To discharge their duties, the officers and directors of Tivity were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

80.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tivity, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Tivity's Board at all relevant times.

81.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

82.     To discharge their duties, the officers and directors of Tivity were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Tivity were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Tennessee, and the United States, and pursuant to Tivity's own Code of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Tivity conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Tivity and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Tivity's operations would comply with all

laws and Tivity's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

83.      Each of the Individual Defendants further owed to Tivity and the shareholders the duty of loyalty requiring that each favor Tivity's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

84.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Tivity and were at all times acting within the course and scope of such agency.

85.      Because of their advisory, executive, managerial, and directorial positions with Tivity, each of the Individual Defendants had access to adverse, non-public information about the Company.

86.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tivity.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

87.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

88.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

89.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Tivity was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

90.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

91.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Tivity, and was at all times acting within the course and scope of such agency.

## TIVITY'S CODE OF CONDUCT

92.     Tivity's Code of Conduct provides that "[t]he Code applies to all colleagues and to each Director on our Board of Directors."

93.     In a section titled, "Accuracy of our Books and Records," the Code of Conduct states the following:

> Federal law requires that the Company maintain adequate controls to assure that the information set forth in books and records is accurate, timely and complete, including financial records, expense reports, time-worked reports, customer and vendor contracts, and personnel-related documents completed by colleagues.
>
> The deliberate falsification of Company contracts, reports or records is a serious and direct violation of the Code and may be a violation of law.
>
> Falsification of records consists of altering, fabricating, falsifying, forging or deliberately omitting any part of a document, contract or record for the purpose of gaining an advantage, or misrepresenting the value of the document, contract, or record.
>
> Colleagues must ensure that all disclosures in our periodic reports and submissions filed with the Securities and Exchange Commission ("SEC") and other public communications are full, fair, accurate, timely, and understandable.
>
> Colleagues responsible for recording transactions or events into the Company's

records may not intentionally delay them, or intentionally record incorrect, incomplete or misleading information about any transaction or event. Other colleagues who are not responsible for recording transactions or events must ensure that all information submitted for recording is timely, accurate, and complete.

94.     In a section titled, "Financial Controls," the Code of Conduct provides that "[e]very colleague is responsible for creating and complying with the Company's internal controls for financial reporting."

95.     In a section titled, "Fair Dealing," the Code of Conduct states the following:

We place great value on partnerships with our customers, suppliers, members, and their families, and require that each of these constituencies be treated with fairness and integrity. This means not providing any customer or supplier an unfair advantage over another, or making false or misleading statements about our products or services to secure a business relationship. We insist on this same level of integrity in all dealings with our competitors.

96.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

97.     Tivity is a Tennessee-based provider of fitness, nutrition, and various social connections solutions through its Nutrition and Healthcare segments. The Company was founded in 1981 under the name "Healthways, Inc.," and rebranded itself as Tivity Health, Inc. in January 2017.

98.     In early December 2018, the Company announced its intention to acquire Nutrisystem, a healthcare company offering various weight loss products and related services. Specifically, in a press release issued on December 10, 2018 titled "Tivity Health to Acquire Nutrisystem for $1.3 Billion in Cash and Stock," the Company stated the following:

- Combination and increased scale will create unique new value proposition for shareholders, health plans, fitness partners, members and consumers - supporting healthier lifestyles and lowering medical costs
- With the addition of Nutrisystem, Tivity Health will deliver a unique "calories in and calories out" solution
- Expect double digit accretion to Tivity Health's adjusted EPS in 2020 and beyond
- Significant potential for value creation with expected annual cost synergies of ~$30-35 million
- New business model with projected substantial cash flow to de-lever the balance sheet

NASHVILLE, Tenn. and FORT WASHINGTON, Pa., Dec. 10, 2018 /PRNewswire/ -- Tivity Health, Inc. (Nasdaq: TVTY), a leading provider of fitness and health improvement programs, and Nutrisystem, Inc. (Nasdaq: NTRI), a leading provider of weight management products and services, today announced that they have entered into a definitive agreement under which Tivity Health will acquire all of the outstanding shares of Nutrisystem for a combination of cash and stock. Under the terms of the agreement, which has been unanimously approved by the Boards of Directors of both companies, Nutrisystem shareholders will receive $38.75 per share in cash and 0.2141 Tivity Health shares for each share of Nutrisystem common stock. The transaction values Nutrisystem at an enterprise value of $1.3 billion and an equity value of $1.4 billion, or approximately $47.00 per share. The implied stock consideration of $8.25 per Nutrisystem share is based on the volume-weighted average price of Tivity Health's stock for the 10 days ended December 3, 2018. The implied transaction consideration of $47.00 per share represents a 30% premium based on the volume-weighted average price for Nutrisystem over the last five trading days.

The combined company will be unique in offering, at scale, an integrated portfolio of fitness, nutrition and social engagement solutions to support overall health and wellness. Through this expanded portfolio, Tivity Health will be better positioned to address weight management – a major factor contributing to many chronic diseases. The diversification of Tivity Health's portfolio and increased scale will benefit all the company's stakeholders – including health plans, fitness partners, members and consumers – as these offerings support healthier lifestyles and can lower medical costs. Tens of millions of Americans are currently eligible for Tivity Health's    SilverSneakers®,    Prime® Fitness,    WholeHealth    Living™and

flip50™ programs, and millions of people have lost weight with Nutrisystem's products, including Nutrisystem®, South Beach Diet® and DNA BodyBlueprint™.

This transaction will also create meaningful value for Tivity Health's shareholders through the addition of a new independent revenue stream, cost and revenue synergies, and significant potential growth opportunities. The combination of Tivity Health's and Nutrisystem's highly trusted brands and strong marketing and data analytics expertise will allow the combined company to increase awareness and member enrollment and engagement across all consumer audiences. The acquisition of Nutrisystem will further elevate Tivity Health as a leading health and wellness company offering comprehensive fitness, nutrition and social engagement solutions.

99.    Analysts were quick to question the Individual Defendants' positive characterization of the Company's planned Nutrisystem acquisition. For instance, on December 10, 2018, Oppenheimer issued a report commenting on the acquisition, stating, among other things, that the acquisition "complicates an otherwise clean story that was focused on senior health and living," and that "investors are taking the 'sell first and ask questions later' approach as the deal takes away near-term upside in favor of long-term potential." Yet, the Oppenheimer report indicated that "we believe management's credibility affords them the opportunity to prove their bet will pay off." Also on December 10, 2018, Jefferies issued a report stating that the acquisition of Nutrisystem, which had been experiencing a growth slowdown, could unnecessarily complicate the Company's business model.

100.    The Company completed its acquisition of Nutrisystem on March 8, 2019. In connection with the acquisition, the Company paid approximately $1.3 billion in cash and stock.

101.    Following the acquisition, investor analysts continued to point to certain drawbacks regarding the acquisition, and its impact on the Company's prospects. On August 8, 2019, Barrington Research issued a report stating, "[t]he material balance sheet leverage (over $1 billion) that was taken on to do this deal given the recent disappointing operational results at Nutrisystem . . . made this deal a bit of a head-scratcher right out of the gate." Similarly, on June 25, 2019,

William Blair issued a report claiming that the acquisition was "the main culprit that drove the elimination of roughly half of the company's market capitalization over the past six months."

## Materially False and Misleading Statements

### March 8, 2019 Press Release

102.    On March 8, 2019, the Company issued a press release announcing the completion of Tivity's acquisition of Nutrisystem. The press release stated the following, in relevant part:

> NASHVILLE, Tenn., March 8, 2019 /PRNewswire/ -- Tivity Health®, Inc. (Nasdaq: TVTY), a leading provider of fitness and health improvement programs, today announced that it has completed its previously announced acquisition of Nutrisystem, Inc., a leading provider of weight management products and services, for approximately $1.3 billion in cash and stock. With this acquisition, Tivity Health will be unique in offering, at scale, an integrated portfolio of fitness, nutrition and social engagement solutions to support overall health and wellness.
>
> * * *
>
> Tivity Health believes this powerful *Calories In+Calories Out* combination will offer a holistic approach to addressing critical health needs, lowering healthcare costs, and creating additional value for shareholders, health plans, fitness partners, members and consumers. The combined company will have a footprint of more than 75 million members eligible for Tivity Health's SilverSneakers®, Prime® Fitness, WholeHealth Living™ and flip50™ programs and millions of consumers for Nutrisystem's Nutrisystem®, South Beach Diet®, and DNA Body Blueprint™ products, creating multiple opportunities to increase engagement across all brands.
>
> "We welcome Nutrisystem's powerful brands and talented team to the Tivity Health family. Both Nutrisystem and Tivity Health have successful track records improving health, both in the lives of consumers and health plan members, as well as in the communities where we do business. That experience, coupled with our shared commitment to our varied stakeholders, will power successful execution on the many opportunities that lie ahead," said Donato Tramuto, Tivity Health's Chief Executive Officer. "Since announcing the transaction, we have received overwhelmingly supportive feedback from our health plan customers, members and fitness partners about their interest in the broad array of offerings of our combined company. Our integrated approach – which addresses many of the social determinants of health fundamental to wellness – includes fitness, nutrition and social isolation, and represents a powerful offering to support healthier lifestyles, combat chronic conditions and lower medical costs. Tivity Health is now a formidable player in where the market is going – moving away from merely 'sick care' toward fully addressing healthcare."

*April 12, 2019 Proxy Statement*

103.    On April 12, 2019, the Company filed its 2019 Proxy Statement with the SEC. Defendants Tramuto, Zier, Finley, Greczyn, Hudson, Jacob, Karro, Keckley, Kirshner, Shapiro, and Wills solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

104.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated that "[o]ur Code of Business Conduct applies to all employees (including officers) and non-employee directors," and provided that the Code of Conduct's purpose is "to provide written standards that are reasonably designed to promote: honest and ethical conduct; full, fair, accurate, timely and understandable disclosure in reports and documents we file with the Commission and other public communications we make."

105.    The 2019 Proxy Statement also called for shareholder approval of the Company's Second Amended and Restated 2014 Stock Incentive Plan (the "2014 Stock Incentive Plan"), which would authorize the Company to, among other things, (1) reserve an additional 2 million shares of Company stock to be issued to the Company's officers and directors in connection with performance-based awards; and (2) increase the maximum amount of cash-based performance awards that may be awarded to officers and directors in a given 12-month period to $5 million.

106.    The 2019 Proxy Statement was false and misleading because the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

107.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) Tivity's integration of Nutrisystem into the Company's Nutrition segment was not proceeding as well as the Individual Defendants purported, and consequently, the Nutrition segment was facing serious operational challenges; (2) the foregoing issues would predictably have a substantial negative impact on the Company's financial results and overall prospects; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

108.    As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders approved the 2014 Stock Incentive Plan.

### May 8, 2019 Press Release

109.    On May 8, 2019, the Company issued a press release disclosing its financial results for the fiscal quarter ended March 31, 2019 (the "1Q19 Press Release"). The 1Q19 Press Release quoted Defendant Tramuto, who described the Company's integration of Nutrisystem as follows:

> "I am pleased with Tivity Health's first quarter financial results. Additionally, the combination of our first-ever SilverSneakers® national television advertising campaign, coupled with our digital strategy, contributed to an increase in total visits. We also saw increased subscriptions in Prime® Fitness," said Donato Tramuto, Tivity Health's Chief Executive Officer. ***"We closed our acquisition of Nutrisystem on March 8, 2019 and the Nutrition segment benefited from strong adjusted EBITDA, due to better than expected March program starts and timing of marketing spend. As a result of the successful media and digital strategy in the first quarter, we plan to leverage Nutrisystem's media and marketing expertise to further increase enrollment and engagement in SilverSneakers and Prime Fitness."***

> Tramuto continued, "We are pleased that Medicare Advantage plans will soon be able to provide coverage for a wider variety of benefits that are not primarily health-related as CMS adds coverage for social determinants of health. As Dr. William Shrank, Chief Medical Officer of Humana, Inc., has stated, "Addressing food insecurity, social isolation and loneliness is at the heart of our Bold Goal initiative. To improve the health of the communities we serve, we need partners like Tivity Health who share our commitment to improve overall health with solutions that address social determinants."

(Emphasis added.)

110.    The 1Q19 Press Release also stated the following regarding the Company's Nutrition segment:

> Nutrition Segment – Revenue was $57.6 million, and Adjusted EBITDA was $13.3 million for the 24-day period March 8, 2019 through March 31, 2019.
>
> ***"Our integration efforts are going well and we are on track to deliver the $9 million to $12 million of cost synergies for 2019 as previously discussed," said Adam Holland, Tivity Health's Chief Financial Officer.***

(Emphasis added.)

### *May 9, 2019 Form 10-Q*

111.    On May 9, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 with the SEC (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendant Holland, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Tramuto and Holland attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

112.    The 1Q19 10-Q stated the following regarding the Nutrisystem acquisition:

> On December 9, 2018, we entered into an Agreement and Plan of Merger (the "Merger Agreement") with Nutrisystem, a provider of weight management products and services, and Sweet Acquisition, Inc., a wholly-owned subsidiary of Tivity Health ("Merger Sub"). The Merger Agreement provided that Merger Sub would merge with and into Nutrisystem, with Nutrisystem surviving as a wholly-owned subsidiary of Tivity Health (the "Merger"). The Merger was completed on March 8, 2019 ("Closing"). At Closing, except for certain excluded shares, each share of Nutrisystem common stock outstanding immediately prior to Closing was converted into the right to receive $38.75 in cash, without interest, and 0.2141 of a share of Tivity Health Common Stock ("Exchange Ratio") (with cash payable in lieu of any fractional shares). Nutrisystem shares excluded from the conversion were those shares held by Nutrisystem as treasury stock and shares with respect to

which appraisal rights have been properly exercised in accordance with the General Corporation Law of the State of Delaware.

***The acquisition of Nutrisystem enables us to offer, at scale, an integrated portfolio of fitness, nutrition and social engagement solutions to support overall health and wellness and to address weight management, chronic conditions, and social isolation.*** The fair value of consideration transferred at Closing was $1.3 billion ("Merger Consideration"), which includes cash consideration, the fair value of the stock consideration, and the fair value of the consideration for Nutrisystem equity awards assumed by Tivity Health that related to pre-combination services.

(Emphasis added.)

113.    The 1Q19 10-Q also stated the following regarding the Company's internal controls:

The Company's principal executive officer and principal financial officer have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) as of March 31, 2019. ***Based on that evaluation, the principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective***. They are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms and to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including the principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

\* \* \*

Beginning January 1, 2019, we adopted ASC 842, "Leases." We implemented changes to our processes and the related control activities related to lease accounting. As a result of the acquisition of Nutrisystem on March 8, 2019, we have implemented internal controls over financial reporting to include consolidation of Nutrisystem. Nutrisystem utilizes separate information and accounting systems and processes. We are in the process of reviewing and evaluating the design and operating effectiveness of internal control over financial reporting relating to Nutrisystem's operations, and, as a result, certain controls may be changed.

Except as disclosed above, ***there were no changes in the Company's internal controls over financial reporting during the three months ended March 31, 2019***

*that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added.)

114.    Over the next several days, a number of investor analysts issued positive reports on the Company and its integration of Nutrisystem. For instance, on May 8, 2019, both Cantor Fitzgerald and William Blair issued reports claiming that the Company's Nutrisystem integration was "off to a good start," with the Cantor Fitzgerald report raising its price target for Tivity. Additionally, on May 9, 2019, SunTrust Robinson Humphrey issued a report stating that Tivity had enjoyed a "solid start" to the year, with solid first quarter results in both its Healthcare and Nutrition segments.

### August 8, 2019 Form 10-Q

115.    On August 8, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 with the SEC (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendant Holland, and contained SOX certifications signed by Defendants Tramuto and Holland attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

116.    The 2Q19 10-Q made substantially similar representations regarding the Nutrisystem acquisition as the 1Q19 10-Q, stating the following:

> On December 9, 2018, we entered into an Agreement and Plan of Merger (the "Merger Agreement") with Nutrisystem, a provider of weight management products and services, and Sweet Acquisition, Inc., a wholly-owned subsidiary of Tivity Health ("Merger Sub"). The Merger Agreement provided that Merger Sub would merge with and into Nutrisystem, with Nutrisystem surviving as a wholly-owned subsidiary of Tivity Health (the "Merger"). The Merger was completed on March 8, 2019 ("Closing"). At Closing, except for certain excluded shares, each share of Nutrisystem common stock outstanding immediately prior to Closing was converted into the right to receive $38.75 in cash, without interest,

and 0.2141 of a share of Tivity Health Common Stock ("Exchange Ratio") (with cash payable in lieu of any fractional shares). Nutrisystem shares excluded from the conversion were those shares held by Nutrisystem as treasury stock and shares with respect to which appraisal rights have been properly exercised in accordance with the General Corporation Law of the State of Delaware.

*The acquisition of Nutrisystem enables us to offer, at scale, an integrated portfolio of fitness, nutrition and social engagement solutions to support a healthy lifestyle and to address weight management, chronic conditions, and social determinants of health.* The fair value of consideration transferred at Closing was $1.3 billion ("Merger Consideration"), which includes cash consideration, the fair value of the stock consideration, and the fair value of the consideration for Nutrisystem equity awards assumed by Tivity Health that related to pre-combination services.

(Emphasis added.)

117. The 2Q19 10-Q also stated the following regarding the Company's internal controls:

The Company's principal executive officer and principal financial officer have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) as of June 30, 2019. *Based on that evaluation, the principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective*. They are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms and to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including the principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

\* \* \*

*There were no changes in the Company's internal controls over financial reporting during the three months ended June 30, 2019 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added.)

*November 12, 2019 Form 10-Q*

118.    On November 12, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019 with the SEC (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendant Holland, and contained SOX certifications signed by Defendants Tramuto and Holland attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

119.    The 3Q19 10-Q made substantially the same representations regarding the Nutrisystem acquisition as the 1Q19 and 2Q19 10-Qs, stating the following:

> On December 9, 2018, we entered into an Agreement and Plan of Merger (the "Merger Agreement") with Nutrisystem, a provider of weight management products and services, and Sweet Acquisition, Inc., a wholly-owned subsidiary of Tivity Health ("Merger Sub"). The Merger Agreement provided that Merger Sub would merge with and into Nutrisystem, with Nutrisystem surviving as a wholly-owned subsidiary of Tivity Health (the "Merger"). The Merger was completed on March 8, 2019 ("Closing"). At Closing, except for certain excluded shares, each share of Nutrisystem common stock outstanding immediately prior to Closing was converted into the right to receive $38.75 in cash, without interest, and 0.2141 of a share of Tivity Health Common Stock ("Exchange Ratio") (with cash payable in lieu of any fractional shares). Nutrisystem shares excluded from the conversion were those shares held by Nutrisystem as treasury stock and shares with respect to which appraisal rights have been properly exercised in accordance with the General Corporation Law of the State of Delaware.
>
> ***We believe that the acquisition of Nutrisystem will enable us to offer, at scale, an integrated portfolio of fitness, nutrition and social engagement solutions to support a healthy lifestyle and to address weight management, chronic conditions, and social determinants of health.*** The fair value of consideration transferred at Closing was $1.3 billion ("Merger Consideration"), which includes cash consideration, the fair value of the stock consideration, and the fair value of the consideration for Nutrisystem equity awards assumed by Tivity Health that related to pre-combination services.

(Emphasis added.)

120.    The 3Q19 10-Q also stated the following regarding the Company's internal controls:

he Company's principal executive officer and principal financial officer have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) as of September 30, 2019. ***Based on that evaluation, the principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective***. They are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms and to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including the principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

\* \* \*

***There were no changes in the Company's internal controls over financial reporting during the three months ended September 30, 2019 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.***

(Emphasis added.)

121.    The statements referenced in ¶¶ 102, 109–113, and 115–120 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Tivity's integration of Nutrisystem into the Company's Nutrition segment was not proceeding as well as the Individual Defendants purported, and consequently, the Nutrition segment was facing serious operational challenges; (2) the foregoing issues would predictably have a substantial negative impact on the Company's financial results and overall prospects; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

122.    After the close of trading on February 19, 2020, the Company issued a press release disclosing its financial results for the fiscal quarter and full year ended December 31, 2019. The

press release disclosed a disappointing performance from the Company's Nutrition segment during 2019, which contributed to a net loss of $323.1 million for the quarter, stating the following:

> "Our fourth quarter and fiscal year results in our Healthcare segment reflect the inherent strength of our flagship brands SilverSneakers® and Prime® Fitness. We expect the Healthcare segment's total revenue to grow at a rate of eight to ten percent in 2020," said Bob Greczyn, Tivity Health's Interim Chief Executive Officer.

> "And while the Nutrition segment had a disappointing end to 2019, it remains profitable, and we believe it will continue to generate significant cash flow. Management and our Board of Directors are committed to making the right investments for this business with a focus on innovation, execution, and new advertising strategies to return the business to growth."

> * * *

> Net loss in the fourth quarter of $(323.1) million included a non-cash impairment charge of $(377.1) million in the Nutrition segment.  In connection with its annual impairment test, the Company concluded that the fair values of both goodwill and the Nutrisystem tradename were below their carrying amounts.

123.   That same day, the Company announced that effective immediately, Defendant Tramuto would be resigning from his positions with the Company, with Defendant Greczyn assuming the role of interim CEO.

124.   Later that same day, the Company held a conference call to discuss its financial results with investors and analysts. During the call, Defendant Greczyn revealed that the Company's Nutrition segment had "not worked out as well as planned" since the Company acquired Nutrisystem, stating the following, in relevant part:

> Our Healthcare business remained strong, is performing well and is profitable. That business has a strong leadership team and generate significant free cash flow. As Adam will discuss, we expect increased top line growth in 2020. ***Admittedly, the Nutrition business has not worked out as well as planned since the completion of the acquisition in March of 2019***. We have made some good progress in the past 10 months, particularly in our approach to digital marketing, and we're seeing some promising results in certain key growth metrics for our Nutrisystem brand. ***We believe there are areas where we can improve our operational execution and although performing well below its potential, the Nutrition business unit remains profitable and generates free cash flow.***

(Emphasis added.)

125.    Defendant Holland also commented on the performance of the Company's

Nutrition segment as follows:

> Turning now to the Q4 results of Nutrition segment. Fourth quarter nutrition revenues came in at $113.7 million, a 12.2% decrease compared to the same quarter last year. ***This decline was primarily driven by a decrease in the DTC business, which includes both the Nutrisystem and South Beach Diet brands.***
>
> * * *
>
> ***In addition, we recorded a noncash impairment charge of $240 million to lower the carrying amount of the Nutrisystem trade name.***

(Emphasis added.)

126.    During the call, the following exchange took place between Defendant Wills and

an analyst on the subject of Nutrisystem's performance:

> [Analyst]: And then a little bit broader question. With Donato, his termination, obviously, reflecting disappointment with the transaction and subsequent results. Has the Board opened any strategic alternatives for Nutrisystems? Or is it it's still kind of all systems go with integrating that and running it as a combined entity?
>
> [Defendant Wills]: Ryan, this is Kevin. I'll take that question. The Board remains committed to our strategy. ***As indicated in our prepared remarks, we have been disappointed with the Nutrisystem performance. We believe there are a number of reasons for that to include increased competition, some operational missteps, lack of innovation***, all of which we believe we can correct and move forward and get fixed. So we remain committed to put in these two brands together and moving forward. Obviously, our profitability has decreased over the last couple of years, but we see no reason why we can't return to levels that we were previously at.

(Emphasis added.)

127.    On this news, the price of the Company's stock plunged from $22.93 per share at

the close of trading on February 19, 2020, to $12.50 per share at the close of trading on February

20, 2020, representing a loss in value of over 45%.

128.    Subsequently, on February 19, 2020, Credit Suisse issued a report commenting on the dismal performance of Tivity's Nutrition segment as follows, in relevant part:

> Challenges in Nutrition Segment Continue as 4Q Misses Expectations; Leadership Transitions Announced. Tivity reported 4Q19 adjusted EPS of $0.40, $0.16/$0.15 below CSe/Cons. 4Q19 revs were $272.8 mln, $0.6/$2.2 mln below CSe/Cons, while adjusted EBITDA of $55.5 mln was $8.8/$8.5 mln below CSe/Cons. The miss on adjusted EBITDA was primarily driven by the Nutrition segment as the Healthcare segment came in slightly better than our expectations.
>
> * * *
>
> Nutrition segment revenue was $113.7 mln, down 12.2% Y/Y (on a comparable basis) and $5.6/$6.3 mln below CSe/Cons. The Y/Y decline was primarily driven by a decrease in the DTC business, which includes both the Nutrisystem and South Beach Diet brands.

### Repurchases

129.    During the period in which the Company made false and misleading statements and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $1.41 million to repurchase approximately 78,258 shares[3] of its own common stock at artificially inflated prices.

130.    According to the 2Q19 10-Q, during June 2019, the Company purchased 9,454 shares of its common stock for approximately $180,855, at an average price of $19.13 per share.

131.    As the Company's stock was actually worth only $12.50 per share, the price at closing on February 20, 2020, the Company overpaid by approximately $62,680 for repurchases of its own stock during June 2019.

---

[3] According to the Company, these shares include "shares attributable to the withholding of shares by Tivity Health to satisfy the payment of tax obligations related to the vesting of restricted shares."

132.     According to the 3Q19 10-Q, during July 2019, the Company purchased 1,108 shares of its common stock for approximately $18,503, at an average price of $16.70 per share.

133.     As the Company's stock was actually worth only $12.50 per share, the price at closing on February 20, 2020, the Company overpaid by approximately $4,653 for repurchases of its own stock during July 2019.

134.     According to the 3Q19 10-Q, during August 2019, the Company purchased 2,167 shares of its common stock for approximately $37,510, at an average price of $17.31 per share.

135.     As the Company's stock was actually worth only $12.50 per share, the price at closing on February 20, 2020, the Company overpaid by approximately $10,423 for repurchases of its own stock during August 2019.

136.     According to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), during October 2019, the Company purchased 36,902 shares of its common stock for approximately $586,741, at an average price of $15.90 per share.

137.     As the Company's stock was actually worth only $12.50 per share, the price at closing on February 20, 2020, the Company overpaid by approximately $125,466 for repurchases of its own stock during October 2019.

138.     According to the 2019 10-K, during December 2019, the Company purchased 265 shares of its common stock for approximately $5,954, at an average price of $22.47 per share.

139.     As the Company's stock was actually worth only $12.50 per share, the price at closing on February 20, 2020, the Company overpaid by approximately $2,642 for repurchases of its own stock during December 2019.

140.     According to the Company's quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2020 (the "1Q20 10-Q"), during January 2020, the Company purchased 28,232 shares of its common stock for approximately $579,038, at an average price of $20.51 per share.

141.     As the Company's stock was actually worth only $12.50 per share, the price at closing on February 20, 2020, the Company overpaid by approximately $226,138 for repurchases of its own stock during January 2020.

142.     According to the 1Q20 10-Q, during February 2020, the Company purchased 130 shares of its common stock for approximately $2,917, at an average price of $22.44 per share.

143.     As the Company's stock was actually worth only $12.50 per share, the price at closing on February 20, 2020, the Company overpaid by approximately $1,292 for repurchases of its own stock during February 2020.

144.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $433,293.

## DAMAGES TO TIVITY

145.     As a direct and proximate result of the Individual Defendants' conduct, Tivity will lose and expend many millions of dollars.

146.     Such losses include the Company's overpayment by approximately $433,293 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

147.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its former CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

148.     Such costs include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

149.    As a direct and proximate result of the Individual Defendants' conduct, Tivity has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

150.    Plaintiff brings this action derivatively and for the benefit of Tivity to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Tivity, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

151.    Tivity is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

152.    Plaintiff is, and has been at all relevant times, a Tivity shareholder. Plaintiff will adequately and fairly represent the interests of Tivity in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

153.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

154.    A pre-suit demand on the Board of Tivity is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Finley, Greczyn, Hudson, Jacob, Karro, Kirshner, and Tully (the "Director-Defendants"), along with non-parties Richard M. Ashworth, Erin L. Russell, and Anthony M. Sanfilippo (together with the

Director-Defendants, the "Directors"). Plaintiff only needs to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

155.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact, and, at the same time to cause the Company to overpay by approximately $433,293 for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

156.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

157.    Additional reasons that demand on Defendant Finley is futile follow. Defendant Finley has served as a Company director since 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Strategic Review Committee. Defendant Finley has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Finley breached

- 44 -

her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Greczyn is futile follow. Defendant Greczyn has served as a Company director since 2015. Previously, he served as the Company's interim CEO from February 18, 2020 until May 21, 2020. Defendant Greczyn has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Greczyn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Hudson is futile follow. Defendant Hudson has served as a Company director since 2016. He also serves as a member of the Audit Committee and the Strategic Review Committee. Defendant Hudson has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hudson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Jacob is futile follow. Defendant Jacob has served as a Company director since 2018. She also serves as a member of the Audit Committee and the Compensation Committee. Defendant Jacob has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Jacob breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Karro is futile follow. Defendant Karro has served as a Company director since 2014. He also serves as the Chair of the Compensation Committee and as a member of the Strategic Review Committee. Defendant Karro has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Karro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Kirshner is futile follow. Defendant Kirshner has served as a Company director since March 8, 2019. He also serves as a member of the Nominating and Corporate Governance Committee and the Strategic Review Committee.

Defendant Kirshner has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kirshner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Tully is futile follow. Defendant Tully has served as a Company director since August 7, 2019. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Tully breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on the Board is futile follow.

165.    Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of unnecessary and harmful repurchases that caused the Company to overpay by hundreds of thousands of dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face

a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

166.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Finley and Karro both served in a number of senior roles at Caremark Rx and its predecessor entities between 1998 and 2007, including as Senior Vice President and Assistant General Counsel, and as Executive Vice President, respectively. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

167.    Defendants Hudson and Jacob (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's compliance with applicable laws and regulations, the Company's accounting and financial reporting processes, and the performance of the Company's internal audit function. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

168.    Additionally, Defendants Finley, Hudson, Karro, and Kirshner (the "Strategic Review Committee Defendants"), served on the Company's Strategic Review Committee during

the Relevant Period. According to the 2020 Proxy Statement, the Strategic Review Committee Defendants were responsible for, *inter alia*, "assist[ing] the Board with risk oversight by reviewing, evaluating, and making recommendations to the Board regarding the Company's business strategy." The Strategic Review Committee Defendants failed to fulfill their duties, allowing the Individual Defendants to make false and misleading statements and engage in other misconduct as described herein. Thus, the Strategic Review Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

169.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's involvement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

170.    Tivity has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Tivity any part of the damages Tivity suffered, and will continue to suffer, thereby. Thus, any demand on the Director-Defendants would be futile.

171.    The Individual Defendants' conduct described herein and summarized above, including the decision for the Company to engage in the repurchases of its own stock, could not have been the product of legitimate business judgment as it was based on bad faith and intentional,

reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

172.    The acts complained of herein constitute violations of fiduciary duties owed by Tivity's officers and directors, and these acts are incapable of ratification.

173.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Tivity. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Tivity, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

174.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Tivity to sue the Individual Defendants named herein, since, if they did,

they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

175.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

176.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

178.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

179.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) Tivity's integration of Nutrisystem into the Company's Nutrition

segment was not proceeding as well as the Individual Defendants purported, and consequently, the Nutrition segment was facing serious operational challenges; (2) the foregoing issues would predictably have a substantial negative impact on the Company's financial results and overall prospects; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

180.   The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

181.   Moreover, the 2019 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

182.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting and failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including but not limited to, election of directors, ratification of the appointment of an independent auditor, advisory approval of executive compensation, and approval of the 2014 Stock Incentive Plan.

183.     The false and misleading elements of the 2019 Proxy Statement led to the approval of the 2014 Stock Incentive Plan, and to the re-election of Defendants Tramuto, Zier, Finley, Greczyn, Hudson, Jacob, Karro, Keckley, Kirshner, Shapiro, and Wills, which allowed them to continue breaching their fiduciary duties to Tivity.

184.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

185.     Plaintiff on behalf of Tivity has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

186.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Tivity. Not only is Tivity now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Tivity by the Individual Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares on the open market at artificially-inflated prices, damaging Tivity.

188.     The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

189.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Tivity not misleading.

190.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Tivity.

191.    The Individual Defendants acted with scienter, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

192.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive, director, and/or controlling shareholder of the Company, they made and/or signed the Company's Form 10-K filed with the SEC during the Relevant Period.

193.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

194.    Plaintiff on behalf of Tivity has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

195.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.    The Individual Defendants, by virtue of their positions with Tivity and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Tivity and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Tivity and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

197.    Plaintiff on behalf of Tivity has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

198.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Tivity's business and affairs.

200.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

201.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Tivity.

202.    In breach of their fiduciary duties owed to Tivity, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Tivity's integration of Nutrisystem into the Company's Nutrition segment was not proceeding as well as the Individual Defendants purported, and consequently, the Nutrition segment was facing serious operational challenges; (2) the foregoing issues would predictably have a substantial negative impact on the Company's financial results and overall prospects; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

203.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

204.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

205.    The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.

206.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tivity's securities.

207.     The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tivity's securities.

208.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

209.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tivity has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

210.     Plaintiff on behalf of Tivity has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Tivity.

213.    The Individual Defendants either benefitted financially from the improper conduct or received profits, bonuses, stock options, or similar compensation from Tivity that was tied to the performance or artificially inflated valuation of Tivity, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

214.    Plaintiff, as a shareholder and a representative of Tivity, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation (including any performance-based or valuation-based compensation)—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

215.    Plaintiff on behalf of Tivity has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

216.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

217.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Tivity, for which they are legally responsible.

218.    As a direct and proximate result of the Individual Defendants' abuse of control, Tivity has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Tivity has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219.    Plaintiff on behalf of Tivity has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

220.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tivity in a manner consistent with the operations of a publicly-held corporation.

222.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Tivity has sustained and will continue to sustain significant damages.

223.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

224.    Plaintiff on behalf of Tivity has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

225.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Tivity to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

227.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

228.    Plaintiff on behalf of Tivity has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Tivity, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Tivity;

(c)    Determining and awarding to Tivity the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Tivity and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tivity and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions

as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Tivity to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Tivity restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.


Dated: July 2, 2020                    Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan_____
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
          mfarnan@farnanlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor

New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net